UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

vs.                                                    Case No. 8:05-CR-365-T-27TBM

SERGIO PORTOCARRERO-REINA; et al.
_____/

## ORDER

**BEFORE THE COURT** is Defendant's Motion to Suppress Custodial Statements (Dkt. 60) and the Government's response in opposition (Dkt. 94). An evidentiary hearing was conducted on May 16-17, 2006. At the conclusion of the hearing, the Court announced its findings of fact and conclusions of law and its ruling. This order memorializes that ruling. The findings and conclusions of law announced in open court are expressly incorporated herein.

Upon consideration, Defendant's Motion to Suppress Custodial Statements (Dkt. 60) is granted to the extent that all statements made by any Defendant in response to questioning by the U.S. Coast Guard boarding party while on board the Rio Mar I are suppressed, other than statements identifying themselves and their country of origin. To the extent Defendant seeks to suppress spontaneous statements, the motion is denied.[1]

After boarding the Columbian F/V Rio Mar I on the early morning hours of August 19, 2005, Arturo Portillo, a member of the Coast Guard boarding crew, questioned Sergio Portocarrero-Reina, the Rio Mar's captain, Ulpiano Mina, the engineer, as well as the other members of the Rio Mar's

---

[1] During the hearing, the Government confirmed that it would not introduce statements made by crew members while on board the USS Jarrett. Defendant Portocarrero-Reina withdrew his motion with respect to statements made at the jail facility in St. Petersburg.

-1-

crew.  Statements were attributed to all Defendants except Leonardo Anchico-Jimenez.  The Government intends to introduce those statements because they allegedly contradict information on the ship's papers, physical evidence found on the Rio Mar, and prior statements made by the crew. In at least one instance, statements are attributed to Portocarrero-Reina and Mina which failed to disclose a sixth fuel tank.  Suffice it to say that the Government intends to introduce these statements to support its theory that the Rio Mar was engaged in drug trafficking rather than, as the crew represented, a fishing voyage.  The statements are therefore incriminating.

Defendants contend that the statements were obtained after Defendants had been taken into custody by the Coast Guard and that *Miranda* warnings were not administered prior to their questioning.  The Government contends that the boarding of the Rio Mar and questioning of the crew was a routine Coast Guard practice and that the crew of the Rio Mar was never in custody until they were transferred to the USS Jarrett on August 22, 2005.

The Coast Guard's routine stop, boarding and inspection of an American vessel on the high seas does not *normally* rise to the level of custodial detention triggering the requirement of *Miranda* warnings.  *U.S. v. Rioseco*, 845 F.2d 299, 302-03 (11th Cir. 1988)(*emphasis added*).  Moreover, that a Coast Guard boarding party is armed and gathers a vessel's crew in a specific area during a search of the vessel "could not lead a reasonable man to believe that he was in custody." *Id.*

With respect to the Rio Mar and her crew, the undisputed facts demonstrate that her stop, boarding and search was anything but routine.  Moreover, the manner in which the crew of the Rio Mar was physically restrained and thereafter detained, rose to a level of detention triggering the requirement of *Miranda* warnings, which were not given prior to the questioning.  While the boarding party may have followed Coast Guard protocol, at least from the Coast Guard's perspective,

their conduct evidences a degree of force and restraint which can only be characterized as a custodial restraint tantamount to an arrest.

For several days prior to the boarding, the Coast Guard had conducted surveillance on the Rio Mar which was operating several hundred miles beyond Columbia's fishing waters in an area known for drug trafficking. She was observed trailing a cable from her stern and appeared to be towing an unidentified object. On August 18, 2005, the Columbian government authorized the Coast Guard to board the Rio Mar and consented to the United States exercising jurisdiction over her after the Coast Guard advised that it suspected the Rio Mar was engaged in illicit trafficking. Under cover of darkness, intended to facilitate surprise, the eight member boarding party conducted an "unannounced night-time boarding" of the Rio Mar brandishing weapons.

As the boarding party approached the Rio Mar, she slowed and her deck lights were illuminated. The boarding party, yelling "Coast Guard, Coast Guard" in Spanish, boarded with weapons drawn. Some members of the boarding party wore masks pulled down over their faces which remained until after the Rio Mar was secured. Each of the boarding party was armed with a 9mm handgun. One had a M4 rifle and another a shotgun. With the Coast Guard weapons aimed at their heads, the crew of the Rio Mar was assembled, handcuffed and forced to lie on her deck with their hands behind their heads for 30 to 45 minutes while the boarding party conducted a sweep of the Rio Mar. The initial physical restraint of the crew by armed force was consistent with the degree of restraint associated with a formal arrest, not a mere investigatory detention as the Government argues.

Although the handcuffs were eventually removed, the crew remained confined under armed guard for the next three and a half days. The moment the Coast Guard boarding team boarded the

Rio Mar on August 19, they exercised actual control over her and her crew. That control was maintained through August 22, when the crew was transferred to the Jarrett.

A suspect is in "custody," for purposes of *Miranda*, if it is evident that "under the totality of the circumstances, a reasonable man in the suspect's position would feel a restraint on his freedom of movement fairly characterized as that 'degree associated with a formal arrest' to such extent that he would not feel free to leave." *U.S. v. Rioseco*, 845 F.2d 299, 303 (11th Cir. 1988)(citing *U.S. v. Phillips*, 812 F.2d 1355, 1360 (11th Cir. 1987).

Here, the facts dictate no other conclusion but that the Rio Mar's crew was effectively arrested at gunpoint and that a reasonable man in their position would have felt restrained to the degree associated with a formal arrest. The degree of force used to physically restrain the crew is characteristic of a suspect's arrest. After the boarding, they were confined to the berthing and galley areas of the Rio Mar. They were not free to leave that area without permission and then only with an armed guard. Until they were transferred to the Jarrett nearly four days later, the Rio Mar crew could not go topside or even use the bathroom without an armed escort. For the Government to argue that they were not in custody is disingenuous. Their confinement was tantamount to having been placed in a modern day jail pod, where inmates cook for themselves, are free to walk around the pod and associate together, but all the while being confined to a secure space.

This Court acknowledges the armed boarding and mustering of the Rio Mar's crew in a specific area during the initial search ordinarily would not lead a reasonable man to believe that he was in custody. *U.S. v. Rioseco*, supra, *U.S. v. Keller*, 451 F.Supp 631 (D.C. Puerto Rico, 1978). As discussed, the boarding of the Rio Mar was anything but a routine safety and inspection boarding, however. The Jarrett was on a drug interdiction mission incident to Operation Panama Express,

-4-

engaged in a law enforcement capacity. Indeed, the boarding party was designated as a law enforcement unit, according to Arturo Portillo. The Jarrett had surveilled the Rio Mar for three days, suspecting her of being engaged in drug trafficking. The Jarrett advised the Columbian Navy of its suspicions when it requested the Columbian government's consent to board the Rio Mar.

The stop and boarding of the Rio Mar was undisputedly a law enforcement action, as the boarding party members well knew. Their testimony that they were not gathering information to build a case is simply incredible and unworthy of belief. The witnesses confirmed that the Rio Mar had been stopped and boarded so a search for cable and chafing gear could be conducted. Moreover, they undoubtedly knew that their questioning of the crew, under the guise of routine boarding protocol, was reasonably likely to elicit incriminating responses. At a minimum, they reasonably knew that the "standard" questions would elicit responses consistent with an innocent fishing voyage and inconsistent with the physical evidence they had observed with respect to the Rio Mar.

Notwithstanding the obvious, the Government's witnesses insisted on describing the boarding and questioning of the Rio Mar's crew as consistent with Coast Guard protocol for routine safety and document inspection boardings. Mr. Portillo, for example, had difficulty answering straightforward questions about the boarding crew's use of force, insisting on qualifying his answers with official Coast Guard jargon. On more than one occasion, he was directed to answer questions directly. In some instances, he would not or could not recall specific facts, such as whether any of the boarding crew carried rifles or shotguns. Mr. Kevin Joseph, on the other hand, readily recalled that one member carried a M4 and another a shotgun, as was customary for boardings in the Eastern Pacific. While this in no way suggests that either of the Government witnesses was untruthful, Portillo's unwillingness to answer questions directly without qualification diminished persuasiveness

of the Government's presentation.

While the Government maintains that the Coast Guard boarding party followed routine boarding protocol and that the use of force was reasonable and necessary to protect the boarding party and secure the Rio Mar, no witness testified that it was routine to engage in the degree of force used by the Jarrett's boarding party. Even if the force used was reasonable, that has no bearing on whether the Rio Mar's crew was restrained to the degree associated with a formal arrest or diminish the custodial restraint involved, for purposes of *Miranda*. Likewise, military jargon and protocol are not determinative of whether the crew was in "custody" for purposes of *Miranda*.

It is apparent to this Court that the use of force in this case was intended to and did restrain the Rio Mar's crew as if they were in custody incident to a criminal investigation. The manner in which the Rio Mar was boarded, even if routine from the standpoint of an unannounced night time boarding, is not determinative of whether the crew as in custody. Those circumstances do confirm that the Coast Guard was treating the boarding as a criminal investigation, rather than a routine safety inspection, as the witnesses seemed to insist.

Moreover, as evidenced by the testimony of the Government's witnesses, a routine boarding and inspection does not typically take three to four days, as it did in this case. It was apparent to the Court from the cross examination of the Government witnesses that the boarding and inspection of the Rio Mar could have been accomplished in no more than two days, had it not been for the delay attendant to the completion of the Coast Guard's criminal investigation. Of note is that the submersible had been located late on the August 19, only 19 hours after the boarding of the Rio Mar. Locating the submersible filled with cocaine ostensibly confirmed the suspicion that the Rio Mar had been towing illicit cargo. By the time the Jarrett reached the submersible, it was 60 miles from the

Rio Mar. The Coast Guard boarding crew on the Rio Mar was directed to change course toward the Jarrett and then sailed the Rio Mar those 60 miles to re-unite with the Jarrett. These events delayed completion of the search of the Rio Mar, including the at sea space 100% accountability search. The duration of the detention of the Rio Mar crew is an additional factor in the totality of circumstances considered in determining whether they were "in custody" for purposes of *Miranda*. Portillo confirmed that the crew was not free to leave during the entire time.

The Government points out that after the vessel was secured, the crew was uncuffed, "mustered" to the bow of the Rio Mar while the initial safety inspection was completed and that they were "transferred" to the main berthing area. (Dkt. 94, p. 2). The Government further argues that the crew was "housed in this area of the vessel to provide them with protection from the weather elements, while also allowing them to cook for themselves in the galley, to sleep in their own berthing areas, to use the bathroom, and to perform chores as necessary." *Id*. This description of what the crew of the Rio Mar endured for four days neglects to acknowledge that the crew was confined to a small area of the vessel below deck the entire time, prevented from going topside without an armed escort and even prevented from using the bathroom without an armed escort. Telling is the Government's own description of the events on the Rio Mar during the detention, by use of terms consistent with the type of restraint associated with a formal arrest:

> The 'boarding team then *secured* the crew on the bow."
> "[T]he crew was *transferred* to the main berthing area."
> The "USCG maintained a *security* watch over the crew."

(Dkt. 94, p. 2)

These descriptions depict individuals who are suspected of crimes being arrested and detained in the custody of armed guards while a criminal investigation is completed. Short of a jail cell or the use of shackles, it is difficult to envision a more restrictive environment. Given the force

used, the confinement of the crew under armed guard and the delayed detention while the Coast Guard completed its criminal investigation, the Court finds that the crew of the Rio Mar was in custody for purposes of *Miranda*.

Accordingly, all statements made by any Rio Mar crew member as a result of questioning by the Coast Guard boarding team are suppressed, with the exception of the individual crew member's identification of themselves and their native country. Spontaneous statements made by the Captain as he walked with Portillo to the port side of the bow that they "knew you were coming" (or words to that effect) and when the crew was directed to move the nets are not subject to suppression.

**DONE AND ORDERED** this 22 day of May, 2006.

**JAMES D. WHITTEMORE**
**United States District Judge**

Copies to: Counsel of Record